IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

UNITED STATES OF AMERICA,

v.                                                                              Criminal Action No. 2:20-cr-42

MONTREL ANTONIO BEASLEY,
         Defendant.

## OPINION

Montrel Antonio Beasley has moved to suppress a gun and drugs that Norfolk police officers Peter Kolb and Kedrick Lee seized from him upon his arrest. He also seeks to suppress his associated incriminating statements. Kolb and Lee seized Beasley because he matched the description an anonymous tipster gave to a 911 operator. The tipster alleged that Beasley had repeatedly brandished a gun outside the Lexington Park Apartments. But when Kolb and Lee arrived at the apartments, they saw no gun, illegal activity, or commotion.

Beasley asks the Court to suppress the evidence Kolb and Lee uncovered during the seizure and his subsequent statements, arguing that they lacked reasonable suspicion to seize him. He also contends that the need to investigate the completed misdemeanor of brandishing a gun does not justify a *Terry* stop in this case.

The Court agrees. Kolb and Lee lacked reasonable suspicion to seize Beasley. And, even if they had reasonable suspicion, Beasley's liberty interest outweighs the government's interest in seizing him to investigate a completed misdemeanor in this case. The Court, therefore, will grant Beasley's motion and suppress the gun, drugs, and incriminating statements.

## I. FACTS[1]

On December 10, 2019, at approximately 4:29 p.m., a woman called Norfolk 911 and reported "a guy sittin' in a wheelchair . . . playin' with a gun." (ECF No. 19-1, at 0:11-0:13.) She also noted that "it's a whole bunch of them out there." (*Id.* at 0:14-0:15.) The woman described the man as a "dark skin black guy" with a "low haircut" who wore "a blue jacket" and "blue jeans." (*Id.* at 0:20-0:33.) The woman clarified that the man had a gun, "and he keep cockin' it back, pointin' it around." (*Id.* at 0:41-0:44.) After prompting from the operator, the woman said the man sat "right in front of the mailboxes" in an apartment complex. (*Id.* at 1:09-1:10.)

The operator then asked the woman if she wanted to leave her name and phone number. She declined, saying, "I mean, it doesn't really matter 'cause they don't even return your call. It's probably the gun that he stole outta my house. That's what I'm assumin'." (*Id.* at 1:13-1:19.) The operator started to ask a question, but before she could, the woman interjected, confessing that she "didn't get close enough to see him." (*Id.* at 1:18-1:20.) The operator finally asked if the woman knew the man's name, and the woman identified the suspect as Montrel Beasley.

Approximately one minute after the 911 call ended, Officers Kolb and Lee responded to an all-points bulletin ("APB") reporting a "person with a weapon 800 East Princess Anne Road, caller advised there is a black male, dark complex, short hair, blue jeans, and a blue jacket in a wheelchair pointing a gun at a group of people near the mailboxes."[2] (ECF No. 19-2, at 16:24-

---

[1] The Court held an evidentiary hearing on the motion to suppress on October 9, 2020. The Court draws the below facts from the evidence presented at the evidentiary hearing and exhibits submitted to the Court both before and during the hearing.

[2] Based on their experience, the officers knew that the address mentioned in the APB referred to the Lexington Park Apartments, which has a high volume of violent crime.

16:37.)³ The officers also received a written summary of the call on the computer in their squad car that "reflect[ed] the information available to the arresting officers at the time of the dispatch call." (ECF No. 23, at 1 n.1.) The written summary read: "bm dark complx, short hair, blue jeans, and blue jkt; states that he is in a wheelchair; states that he keep pointing a gun; states there are a group of ppl around him; nam/Montrell Beaseley; he is near the mailboxes." (Gov't Ex. E.) The summary also indicated that the caller refused to provide her name, telephone number, and address. It did not, however, inform Kolb and Lee that the anonymous tipster used the 911 system or that she personally witnessed Beasley brandish his gun.

Upon arriving at the apartment complex, the officers witnessed several people milling around the parking lot, including a group of people walking toward the mailboxes. When the officers got out of their car, they immediately walked toward the mailboxes. As the officers approached the mailboxes, some of the people walking toward the mailboxes reversed course and walked back toward where they came.⁴ Others, including a man with a puppy, stayed put.

The officers "didn't see anybody doing anything illegal," "committing any crimes," or holding a gun when they arrived. (Hr'g Tr. 86:8, 16.) They also did not observe anyone in a panic. Rather, they saw people "essentially wiling away the day hanging out at the mailboxes or in that vicinity." (*Id.* at 87:4-5.) In fact, Kolb admitted that when he and Lee arrived at the apartments,

---

³ The citations reflect the time indicated in the recording provided to the Court, not the time stamp on the body camera footage.

⁴ Kolb testified that this made him more suspicious of the man at the mailbox, whom the officers later identified as Beasley. He also testified that if they would have stopped walking, that too would have made Beasley more suspicious.

3

"nobody at the scene looked like they were saying, oh, boy, I need to get out of here because this guy's pointing a gun at me." (*Id.* at 98:4-6.)

Once within earshot of Beasley, Kolb called out: "Hey man, let me see your hands, wheelchair guy!" (ECF No. 19-2, at 18:06-18:08.) Beasley moved his hands and crutches, causing Kolb to instruct Beasley to "keep your hands where I can see them, man." (*Id.* at 18:10-18:12.) Beasley complied, raising both his hands and crutches.

Both officers approached Beasley, and Kolb told him that they "got a report that [he was] pointing a gun" and planned to detain him. (*Id.* at 18:16-18:18.) Beasley denied that he had a gun; Kolb responded that they would detain him anyway. At that point, Lee handcuffed Beasley, who continued to deny having a gun and protested that the officers were "violating [his] rights." (*Id.* at 18:24-26.) Lee explained to Beasley that the officers planned to pat him down to determine if he had a gun. Lee also remarked, "I don't know who called. It seem like everybody's knowin' each other, but somebody didn't like you." (*Id.* at 19:24-19:31.)

Kolb instructed Beasley to get out of his wheelchair for the pat down. Beasley explained that he could not, and then he admitted that he had a gun in his pocket. Kolb recovered the gun and twelve rounds of ammunition. Beasley also acknowledged his previous felony conviction and that he had drugs in his pocket.

## II. DISCUSSION

Beasley seeks to exclude the gun and drugs found in his possession after Kolb and Lee seized him.[5] He also asks the Court to exclude the associated incriminating statements as fruit of the poisonous tree. Beasley contends that the tip lacked reliability—and thus did not provide

---

[5] The government agrees that Kolb and Lee seized Beasley "when he submitted to the officers' show of authority by fully raising both his hands in the air." (ECF No. 23, at 14 n.5.)

reasonable suspicion to justify a *Terry* stop—for several reasons: the tipster remained anonymous; did not personally observe him handling the gun; and initially withheld information on the call, including information that revealed a personal bias against him. Beasley also argues that the calm scene at the Lexington Park Apartments upon Kolb's and Lee's arrival further undermined the credibility of the anonymous tip. Moreover, Beasley contends that important information known only to the 911 operator and not relayed to Kolb and Lee—namely, the tipster's location, basis of knowledge of the alleged illegal activity, and use of the 911 system—should not contribute to the Court's reasonable suspicion analysis.

Additionally, Beasley argues that a different standard governs the constitutionality of the seizure here because Kolb and Lee seized him to investigate a completed misdemeanor. Under the balancing test that courts have applied when determining the constitutionality of a *Terry* stop to investigate a completed misdemeanor, Beasley claims that his liberty interest outweighs the government's interest in seizing him.

### A. Traditional Terry *Stop Analysis*

#### 1. *Legal Standard*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A police officer may "seize a person for a brief investigatory stop if he 'observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot.'" *United States v. Slocumb*, 804 F.3d 677, 681 (4th Cir. 2015) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

To justify a stop, the officer must "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392

U.S. at 21. The officer must have "a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Reid v. Georgia*, 448 U.S. 438, 440 (1980). "The level of suspicion must be a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Slocumb*, 804 F.3d at 682 (quoting *United States v. Black*, 707 F.3d 531, 539 (4th Cir. 2013)).

Courts consider the totality of the circumstances when deciding whether an officer had reasonable suspicion to support a *Terry* stop. *See United States v. Arvizu*, 534 U.S. 266, 273 (2002). "In reviewing police action, courts must look at whether the evidence as a whole establishes reasonable suspicion rather than whether each fact has been individually refuted, remaining mindful of 'the practical experience of officers who observe on a daily basis what transpires on the street.'" *United States v. Bowman*, 884 F.3d 200, 213 (4th Cir. 2018) (quoting *United States v. Branch*, 537 F.3d 328, 336-37 (4th Cir. 2008)). "The Government bears the burden of proving that reasonable suspicion justified a warrantless seizure." *United States v. Kehoe*, 893 F.3d 232, 237 (4th Cir. 2018).

### 2. *Reasonable Suspicion to Stop Beasley*

Here, the government argues that several factors gave Kolb and Lee reasonable suspicion to stop Beasley: (1) the 911 call,[6] (2) Beasley's location in a generally high-crime area, (3) the officers' experience investigating crimes at the Lexington Park Apartments, and (4) the officers' "observations of suspicious activity near the mailboxes just before detaining the defendant." (ECF No. 23, at 10.)

---

[6] The government argues that the 911 call alone gave Kolb and Lee reasonable suspicion to seize Beasley because it gave them "accurate, detailed, and contemporaneous information as to the defendant's identity and his criminal conduct" and "'alerted the police officers to a serious and imminent danger.'" (ECF No. 23, at 10 (quoting *United States v. Elston*, 479 F.3d 314, 318-19 (4th Cir. 2007))).

6

At the outset, the Court notes that Beasley's location in a high-crime area and the officers' experience investigating crimes in the Lexington Park Apartments do little to prove the reasonable suspicion needed to seize Beasley. Although a court may consider a person's presence in a high-crime area in a *Terry* analysis, *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000), the Fourth Circuit has cautioned against overemphasizing the importance of that factor because it disproportionately affects disadvantaged communities, particularly "racial minorities and individuals disadvantaged by their social and economic circumstances." *See Black*, 707 F.3d at 542.[7]

Additionally, the Court does not credit the government's assertion that people moving toward and then away from Beasley and the mailboxes indicated suspicious activity. *Bowman*, 884 F.3d at 215 (police must "explain why . . . behavior was suggestive of criminal misbehavior other than to label it 'suspicious'"). Doing so would allow the government to proffer "whatever facts are present, no matter how innocent, as indicia of suspicious activity." *United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011). The Fourth Circuit has expressly cautioned against this. *See Massenburg*, 654 F.3d at 482 ("We recently warned against the Government's proffering 'whatever facts are present, no matter how innocent, as indicia of suspicious activity' and noted that we were 'deeply troubled by the way in which the Government attempts to spin . . . mundane acts into a web of deception.'" (quoting *Foster*, 643 F.3d at 248)).

### a. Anonymous Tips Generally

Thus, the reasonable suspicion analysis in this case largely centers on whether the anonymous 911 call had sufficient indicia of reliability to create reasonable suspicion to seize

---

[7] *See also United States v. Massenburg*, 654 F.3d 480, 488 (4th Cir. 2011) ("The fact that this was a 'high-drug, high-crime area' adds little to the anonymous tip."); *United States v. Mitchell*, 963 F.3d 385, 399 (4th Cir. 2020) (Wynn, J., dissenting); *United States v. Griffin*, 589 F.3d 148, 158 (4th Cir. 2009) (Gregory, J., dissenting).

7

Beasley. *See United States v. Bryant*, 654 F. App'x 622, 625 (4th Cir. 2016) (calling an anonymous tip the "most important" factor in its analysis because it "was the impetus for" the police confronting the suspect and "the most direct evidence supporting" the officer's suspicion of the defendant's criminal behavior). Like in *Bryant*, the anonymous 911 call here "was the impetus for" Kolb and Lee seizing Beasley, and it provided "the most direct evidence" that Beasley committed a crime. Indeed, Kolb admitted that he and Lee detained Beasley "essentially" "just based on the information about the tip that came over the radio." (Hr'g Tr. 90:8-10.)

"[A]n anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." *Alabama v. White*, 496 U.S. 325, 329 (1990). But "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop.'" *Florida v. J.L.*, 529 U.S. 266, 270 (2000) (quoting *White*, 496 U.S. at 327).

In *Navarette v. California*, 572 U.S. 393 (2014), the Supreme Court examined such a situation. There, a woman called 911, alleging that a silver Ford pickup truck recently ran her off the road. 572 U.S. at 395. Eighteen minutes later, a police officer spotted a truck matching the description from the 911 call and pulled it over. *Id.* Another officer joined shortly thereafter. *Id.* The officers approached the truck, smelled marijuana, and, upon searching the truck, found thirty pounds of marijuana. *Id.* The driver and passenger of the truck "moved to suppress the evidence, arguing that the traffic stop violated the Fourth Amendment because the officer lacked reasonable suspicion of criminal activity." *Id.* at 396. In a 5-4 opinion, the Supreme Court upheld the stop, holding that "under the totality of the circumstances, the officer had reasonable suspicion that the driver was intoxicated." *Id.* at 395.

8

In reaching this conclusion, the Court consulted two of its most prominent anonymous tip precedents—*Alabama v. White* and *Florida v. J.L.* In *White*, the Court held that an anonymous tip had sufficient reliability "to create reasonable suspicion of criminal activity" because the tipster correctly predicted the defendant's future behavior, which "demonstrated 'a special familiarity with [the defendant's] affairs'" and "implied that the tipster had 'access to reliable information about that individual's illegal activities.'" *Navarette*, 572 U.S. at 398 (quoting *White*, 496 U.S. at 332).

Conversely, in *J.L.*, the Court "determined that no reasonable suspicion arose from a bare-bones tip that a young black male in a plaid shirt standing at a bus stop was carrying a gun." *Navarette*, 572 U.S. at 398. The tipster in *J.L.* "did not explain how he knew about the gun," and he did not "suggest that he had any special familiarity with the young man's affairs." *Id.* The tipster also did not predict J.L.'s future behavior. *Id.*

After consulting these "useful guides," the Court turned to the officers' seizure of the defendants. *Id.* at 397. First, the Court found that, in contrast to the tipster in *J.L.*, the 911 caller in *Navarette* "necessarily claimed eyewitness knowledge of the" wrongdoing that prompted the call "[b]y reporting that she had been run off the road by a specific vehicle." *Id.* at 399. The Court also noted, again in contrast to the tipster in *J.L.*, that the caller in *Navarette* "reported the incident soon after she was run off the road," which gave the Court "reason to think that the 911 caller . . . was telling the truth." *Id.* at 399. Finally, the Court noted that "the caller's use of the 911 emergency system" indicated the call's veracity because "[a] 911 call has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity." *Id.* at 400.

Those three factors—personal knowledge, temporal proximity, and use of the 911 system—corroborated the anonymous tip's reliability. But the analysis did not end there. Because "a reliable tip will justify an investigative stop only if it creates reasonable suspicion that 'criminal activity may be afoot,'" the Court needed to "determine whether the 911 caller's report of being run off the roadway created reasonable suspicion of an *ongoing crime* such as drunk driving as opposed to *an isolated episode of past recklessness*." *Id.* at 401 (emphasis added) (quoting *Terry*, 392 U.S. at 30). Ultimately, the Court determined that driving someone off the road "bears too great a resemblance to paradigmatic manifestations of drunk driving to be dismissed as an isolated example of recklessness." *Id.* at 403. Thus, although the Court called it a "'close case,'" it held that "[t]he stop was . . . proper." *Id.* at 402, 404 (quoting *White*, 496 U.S. at 332). Notably, the Court did not address "under what circumstances a stop is justified by the need to investigate completed criminal activity." *Id.* at 402 n.2.

### b. *The Anonymous Tip Implicating Beasley*

In this case, the government argues that because the "facts of *Navarette* are similar to those here; the result should be, too." (ECF No. 32, at 2.) But this case differs from *Navarette* in several significant ways. First, and most importantly, the 911 operator did not tell Lee and Kolb the tipster's location, her basis of knowledge, or that she used the 911 system to call in her tip. (Hr'g Tr. 80:13-19, 81:1-3.) In fact, Kolb admitted that the officers "didn't have any information about the tipster that would allow [them] to assess [her] reliability." (Hr'g Tr. 81:9-10.)

Under the collective-knowledge doctrine, information known to the 911 operator but not relayed to the police does not contribute to the reasonable suspicion analysis. *See Massenburg*, 654 F.3d at 493 (noting that the collective-knowledge doctrine does not "apply outside the context

of communicated alerts or instructions").[8] Thus, the Court cannot give the anonymous tip here the inference of veracity that it could give to a 911 call that relayed the tipster's location and firsthand knowledge of illegality. *Cf. Navarette*, 572 U.S. at 399 ("[E]yewitness knowledge" of the alleged crime "lends significant support to the tip's reliability[.]").[9]

Second, Kolb and Lee did nothing to corroborate the informant's "assertion of illegality." *J.L.*, 529 U.S. at 272 ("The reasonable suspicion here at issue requires that a tip be reliable in its *assertion of illegality, not just in its tendency to identify a determinate person.*" (emphasis added)).[10] Instead, they merely arrived on the scene, identified someone who matched the

---

[8] *See also United States v. Kehoe*, 893 F.3d 232, 238 (4th Cir. 2018) (holding that the district court should have treated a phone call as anonymous because the call for service report, "the sole source of information" that the police had about the call, "contain[ed] no information about the . . . caller's identity or basis of knowledge"); *accord United States v. Rickmon*, 952 F.3d 876, 882 n.4 (7th Cir. 2020) ("[T]he government cannot justify an investigative stop based on information that a 911 caller provides to a dispatcher who does not, in turn, notify the police on the scene."); *United States v. Colon*, 250 F.3d 130, 138 (2d Cir. 2001) ("The fact that the 911 operator turned out, after the fact, to have additional information which would have given the arresting officers reasonable suspicion cannot retroactively make their actions objectively reasonable.").

[9] *See also Bryant*, 654 F. App'x 622 at 626 & n.5 (giving an anonymous tip "little weight in [the court's] reasonable-suspicion calculus" partially because the tipster lacked firsthand knowledge of illegality); *cf. United States v. Perkins*, 363 F.3d 317, 324 (4th Cir. 2004) (finding that an anonymous call had sufficient indicia of reliability because "the caller revealed her general location and her basis of knowledge"); *Elston*, 479 F.3d at 318 (observing that an anonymous call that "provides substantial detail about the individuals and alleged criminal activity it describes; . . . discloses the basis of the informant's knowledge; and, . . . *is based on [the informant's] contemporaneous personal observation of the call's subject*" "is more likely to be reliable" (emphasis added)).

[10] *See also Bryant*, 654 F. App'x at 626 (finding that an anonymous tip did not create reasonable suspicion because "similar to *J.L.*, nothing supported the tipster's assertion of illegality beyond his or her bald statement that [the defendant] was carrying a gun inside of his bag"); *United States v. Brown*, 401 F.3d 588, 596 (4th Cir. 2005) ("An anonymous telephone tip that alleges illegal possession of a firearm but that merely identifies a suspect and his location does not itself provide reasonable suspicion for a *Terry* stop.").

description provided by the anonymous informant, and *immediately* seized him. *See Brown*, 401 F.3d at 596 (finding that police officers violated the Fourth Amendment when they seized someone without "observ[ing] any conduct by [the defendant] that would cause them to suspect that he was carrying a firearm").[11]

Third, unlike *Navarette*, this case involves a seizure to investigate a completed misdemeanor, not an ongoing crime. (Hr'g Tr. 86:8-87:16.)[12]

The government claims that "[t]he 911 caller reported an imminent threat to public safety, increasing her reliability." (ECF No. 23, at 19.)[13] But when the officers arrived at the Lexington Park Apartments, they witnessed a calm scene that dispelled any notion that Beasley threatened public safety. Indeed, Kolb admitted that when he and Lee arrived "nobody at the scene looked like they were saying, oh, boy, I need get out of here because this guy's pointing a gun at me." (Hr'g Tr. 98:4-6.)[14] And Lee told Beasley, "It seem like everybody's knowin' each other, but

---

[11] *Cf. Perkins*, 363 F.3d at 324 (finding that an officer had reasonable suspicion to conduct a *Terry* stop in part because he "confirmed the tip's reliability with his own knowledge of the area and with his own observations upon arriving at the scene").

[12] Virginia law makes it "unlawful for any person to point, hold or brandish any firearm . . . in such manner as to reasonably induce fear in the mind of another . . . of being shot or injured." Va. Code § 18.2-282(A). A person who violates this statute commits a misdemeanor. *Id.* At the October 9 hearing, Kolb acknowledged that he "didn't see anybody doing anything illegal" when he arrived on the scene and that, "if Mr. Beasley was brandishing a gun, it was something that was in the past and had been completed." (Hr'g Tr. 86:8, 24-25; 87:1.) Thus, the parties agree that Beasley had completed the misdemeanor of brandishing a gun.

[13] The anonymous tipster's allegation that Beasley brandished a firearm does not, by itself, justify a *Terry* stop because "the Supreme Court has rejected 'an automatic firearm exception to our established reliability analysis.'" *Massenburg*, 654 F.3d at 488 (quoting *J.L.*, 529 U.S. at 272). Thus, "[l]ike any other anonymous tip, a tip concerning firearms must present certain indicia of reliability before it can provide a basis for reasonable, particularized suspicion." *Id.*

[14] The government argues that Lexington Park's residents did not react to Beasley brandishing a firearm because they frequently witness gun violence in and around the apartment

12

somebody didn't like you." The officers also did not appear to feel threatened by Beasley. This significantly undermines the government's claim about the threat's imminence. Moreover, the scene that Kolb and Lee observed contrasted drastically from the scene one would expect if Beasley had recently brandished his gun. That marked contrast *decreases* the anonymous tipster's reliability.

Ultimately, the government asks the Court to condone Kolb and Lee seizing Beasley based on little more than an unreliable anonymous tip. When the officers seized Beasley, they did not know the basis of the tipster's knowledge, her location, or the system she used to call in her tip. Nevertheless, they immediately seized Beasley upon arriving at the Lexington Park Apartments, even though a cursory observation of the scene would have contradicted the tipster's "assertion of illegality." *J.L.*, 529 U.S. at 272. Upholding the constitutionality of this seizure would eviscerate the protections of the Fourth Amendment and "enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful [brandishing] of a gun." *J.L.*, 529 U.S. at 272. The Court cannot allow this. Accordingly, it finds that the anonymous tip lacked "sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." *White*, 496 U.S. at 327.

### B. Terry *Stop to Investigate a Completed Misdemeanor*

Even if Kolb and Lee had reasonable suspicion to seize Beasley, they still could not have used a *Terry* stop in this case to investigate the completed misdemeanor that Beasley allegedly committed. Neither the Supreme Court nor the Fourth Circuit has ever decided whether the Fourth

---

complex. The Court does not credit the argument that people become so inured to gun violence that they react with indifference to someone brandishing a gun.

13

Amendment permits police officers to use a *Terry* stop to investigate a completed misdemeanor. *See Navarette*, 572 U.S. 402 n.2.[15] The Sixth, Eighth, Ninth, and Tenth Circuits have, however, with all four circuits "follow[ing] the *Hensley* facts-and-circumstances test." *Jones*, 953 F.3d at 436. Additionally, the United States District Court for the District of Maryland has also used the *Hensley* test to evaluate the constitutionality of an investigatory stop for a completed misdemeanor. *United States v. Jegede*, 294 F. Supp. 2d 704, 708 (D. Md. 2003).

The *Hensley* test "balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." *Hensley*, 469 U.S. at 228. "The factors in the balance may be somewhat different when a stop to investigate past criminal activity is involved rather than a stop to investigate ongoing criminal conduct. . . . because the governmental interests and the nature of the intrusions involved in the two situations may differ." *Id.* Cognizant of that, courts should

> consider several factors in balancing the security and liberty interests. Does the stop "promote the interest of crime prevention"? Does it further "[p]ublic safety"? How strong is the government's interest in "solving crimes and bringing offenders to justice" in this case? And would "[r]estraining police action until after probable cause is obtained" unnecessarily hinder the investigation or allow a suspect to "flee in the interim"?

*Jones*, 953 F.3d at 437-38 (internal citations omitted) (quoting *Hensley*, 469 U.S. at 228-29). Stated differently, deciding whether the police may use a *Terry* stop to investigate a completed

---

[15] *Cf. United States v. Hensley*, 469 U.S. 221, 229 (1985) ("We need not and do not decide today whether *Terry* stops to investigate all past crimes, however serious, are permitted. It is enough to say that, if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with *a completed felony*, then a *Terry* stop may be made to investigate that suspicion." (emphasis added)); *accord United States v. Jones*, 953 F.3d 433, 436 (6th Cir. 2020) ("The Court left it to the lower courts to apply the traditional Fourth Amendment considerations, rather than create an 'inflexible rule' if and when the question of investigating a completed misdemeanor (or other non-felony crime) came up." (quoting *id.* at 227)).

14

Case 2:20-cr-00042-JAG-DEM   Document 33   Filed 10/30/20   Page 15 of 18 PageID# 166

misdemeanor "turns on the nature of the crime, how long ago the suspect committed it, and the ongoing risk of the individual to the public safety." *Id.* at 437.

In this case, the *Hensley* test weighs in Beasley's favor. The seizure here clearly and significantly intruded upon Beasley's liberty interests. *See J.L.* 529 U.S. at 272 (describing a police search as "intrusive" and "embarrassing"). Moreover, because the police had Beasley's name and could have easily arrested him later, and because he already completed the crime, Beasley's seizure did little to "promote the interest of crime prevention." *Hensley*, 469 U.S. at 228 ("A stop to investigate an already completed crime does not necessarily promote the interest of crime prevention as directly as a stop to investigate suspected ongoing criminal activity."). And nothing indicates that waiting for probable cause to seize Beasley would have allowed him to flee or "remain at large," particularly because the police knew Beasley's name and hobbled condition.

The public safety factor also favors Beasley. Kolb and Lee could not see Beasley's gun when they arrived at the apartment complex, and both officers noticed that the people at the apartment complex seemed unconcerned by Beasley's presence. Accordingly, the anonymous tipster reported, at worst, "an isolated episode of past recklessness" that did not present an imminent or ongoing threat to public safety. *Navarette*, 572 U.S. at 401. Indeed, the complete lack of concern about Beasley's presence exhibited by those around him suggests that Beasley never brandished his gun in the first place. Regardless, at the time of his seizure, Beasley matches

*Hensley*'s description of "a suspect in a past crime who now appears to be going about his lawful business" and, therefore, presents less of a threat to public safety. *Hensley*, 469 U.S. at 228.[16]

"[A]lternatives available to the police also factor" into the *Hensley* balancing test. *United States v. Hughes*, 517 F.3d 1013, 1018 (8th Cir. 2008). In *Hughes*, the court noted that the officer "had 'two less invasive options'" available to him other than stopping and frisking the defendant. *Id.* (quoting *United States v. Wheat*, 278 F.3d 722, 736 (8th Cir. 2001)). He could have "observe[d] the suspect for a considerable length of time, watching for other indications of incipient criminality that would give [him] reasonable suspicion to make an investigatory stop." *Id.* (quoting *Wheat*, 278 F.3d at 736). "He also could have 'initiate[d] a simple consensual encounter, for which no articulable suspicion is required.'" *Id.* (quoting *Wheat*, 278 F.3d at 736). Kolb and Lee also had those two options available to them in this case; but, like the officer in *Hughes*, they declined to use them.[17] Instead, they rushed headlong into an "intrusive" and "embarrassing" seizure. *J.L.*, 529 U.S. at 272.

---

[16] In circumstances different than the one here, evidence could show that a suspect who brandished a gun presented an ongoing or imminent threat to public safety. But even then, the *Hensley* analysis would not automatically favor the government for two reasons. First, in *J.L.*, the Supreme Court specifically declined to adopt a "firearm exception," under which "a tip alleging an illegal gun would justify a stop and frisk even if the accusation would fail standard pre-search reliability testing." 529 U.S. at 272. Applying that same logic, the Court could not make a de facto firearm exception to the *Hensley* balancing testing, under which the police could automatically seize any defendant accused of committing a misdemeanor involving a gun.

Second, the Supreme Court has "consistently eschewed bright-line rules" when analyzing the Fourth Amendment. *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). If the mere accusation of a gun crime automatically results in a court upholding a seizure irrespective of the defendant's liberty interest, then that creates the sort of bright-line rule that the Supreme Court has consistently avoided when interpreting the Fourth Amendment.

[17] Kolb testified that he has conducted over 100 consensual encounters and has developed reasonable suspicion, and even probable cause, during such encounters. He did not explain why he opted not to use that effective investigatory tool in this situation.

Admittedly, the seizure's temporal proximity to the crime's commission weighs in favor of allowing the police to seize Beasley. *See Hensley*, 469 U.S. at 229 ("Particularly in the context of felonies or crimes involving a threat to public safety, it is in the public interest that the crime be solved and the suspect detained as promptly as possible."). But that alone does not overcome the evidence weighing in Beasley's favor. Accordingly, the Court finds that the Fourth Amendment forbids a *Terry* stop to investigate a completed misdemeanor in this case.

### C. Suppression

The government contends that even if Kolb and Lee violated the Fourth Amendment, the Court should not suppress the gun, drugs, or associated statements because "the cost-benefit analysis favors the officers, who acted reasonably in investigating an emergency 911 call about a man brandishing a gun." (ECF No. 23, at 23.)

The exclusionary rule "bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *Davis v. United States*, 564 U.S. 229, 232 (2011). To apply the exclusionary rule, the "positive impacts of exclusion must outweigh the negative impacts." *United States v. McLamb*, 220 F. Supp. 3d 663, 669 (E.D. Va. 2016). Here, the gun, drugs, and associated statements all stem directly from Kolb's and Lee's unconstitutional seizure of Beasley. Excluding the gun, drugs, and associated statements in this case will encourage police officers to respect the Fourth Amendment rights of the citizens whom they protect. Indeed, excluding this evidence will further the exclusionary rule's "sole purpose," which "is to deter future Fourth Amendment violations." *Davis*, 564 U.S. at 236-37. These "positive impacts of exclusion" certainly outweigh any "negative impacts," such as the inability to prosecute Beasley for this offense. Thus, the Court will grant Beasley's motion to suppress and exclude the gun, drugs, and incriminating statements obtained because of Kolb and Lee's unconstitutional seizure.

## III. CONCLUSION

For the foregoing reasons, the Court will grant Beasley's motion to suppress.

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 30 October 2020
Richmond, VA

/s/ _____
John A. Gibney, Jr.
United States District Judge